Carl Wescott
PO Box 190875
San Francisco, CA 94966
*in propria persona*
+1 415 335 5000

FILED

AUG 15 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISON

CV 18     5009

| | |
|---|---|
| Carl Alexander Wescott, | ) Case Number _____ |
| Plaintiff | ) |
| -------------------- versus --------------------) | **CIVIL RIGHTS COMPLAINT** |
| Monette Stephens | ) **42 USC 1983 FIRST & FOURTEENTH** |
| Law Office of Terry A Szucsko, Inc. | ) **AMENDMENTS; BREACH OF CONTRACT** |
| Terry Szucsko, Esq., | ) |
| Defendants | ) JURY TRIAL REQUESTED |

Plaintiff Carl A. Wescott, proceeding *pro se,* complains of Defendant Monette Stephens

("Stephens") and of Defendants Law Office of Terry A. Szucsko, Inc. and Terry Szucsko and in

support of his complaint, the Plaintiff states as follows:

1.    Plaintiff is an individual who is in San Francisco.

2.    Defendant Monette Stephens ("Stephens") is an individual who resides in San Francisco.

Plaintiff and Monette were formerly married.

3.    Defendant Law Offices of Terry A. Szucsko, Inc. ("LOTS") is a California professional

corporation engaged in the practice of law in San Francisco.

**CIVIL RIGHTS COMPLAINT;**
**42 USC 1983 FIRST & FOURTEENTH AMENDMENTS;**
**BREACH OF CONTRACT**

1

4.      Defendant Terry A. Szucsko ("Szucsko") is an attorney practicing law in San Francisco and, on information and belief, Managing Member of LOTS. For stylistic purposes, unless the context requires otherwise, LOTs and Szucsko will be referred to collectively as "Szucsko". This case involves intentional torts and Szucsko, whether agent or principal, is liable for his own tortious conduct.

**Jurisdiction & Venue**

5.      Jurisdiction in this case is invoked pursuant to 28 USC 1331 and 28 USC 1343 based on 42 USC 1983 as well as based on the Declaratory Judgment Act, 28 USC 2202.

6.      Venue in San Francisco is proper as it is the city of residence of Stephens and the business domicile of LOTS and Szucsko and upon information and belief, the residence of Szucsko as well.  San Francisco and San Francisco courts are also the nexus and focus of the tortious conduct and conspiracy complained of.

**Case Summary**

7.      The Plaintiff acknowledges frankly at the outset that there is a federal presumption against involvement in family law cases as being uniquely within the province and expertise of state courts.

8.      However, the Supreme Court has exhibited a willingness to become involved when core federal rights are at stake. *Palmore v. Sidoti*, 466 US 429 (1984). In this case, two misandrist state judges (each notoriously biased against male litigants) engaged in invidious gender

**CIVIL RIGHTS COMPLAINT;**
**42 USC 1983 FIRST & FOURTEENTH AMENDMENTS;**
**BREACH OF CONTRACT**

stereotyping to repeatedly punish the Plaintiff for allegations of spousal abuse that have never been tested in an adversarial hearing and are inherently non-credible. The Plaintiff, a loving father to his three boys, has been cut off from contact with his three boys for years. The same Plaintiff that the state of California provides food stamps for (aka CalFresh/EBT) based on being homeless, indigent, and without an income since his ex-wife rendered him homeless and stole all his possessions has been saddled with over $50,000 per month in maintenance and support and obligations and has been ordered to pay over $15,000,000 in support and related payments. The Plaintiff is effectively being punished for being a male who has angered his ex-wife and her rapacious attorneys.

9.      Specifically, this is a case about a lawyer and his client conspiring with a California Superior Court Judge, Anne-Christine Massullo, and her then-subordinate, Judge Linda Colfax, to violate the Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution by enforcing an Extrajudicial Agreement ("the EJA") to punish the Plaintiff for putative acts of spousal abuse that have never been properly tested in adversarial proceedings. The EJA in turn is based on invidious gender stereotyping: a misandrist proclivity to conclusively presume that a male has engaged in spousal abuse. The Plaintiff's punishment has taken two forms: (1) a blanket prohibition in the form of a restraining order preventing *any* contact, whether supervised or unsupervised with the Plaintiff's three minor children. The Plaintiff has been prevented from even speaking to his three sons for over two years. Part of the justification for this draconian prohibition is undescribed "inappropriate" language on a Skype call that implicates First Amendment protections as well. The United States Supreme Court has observed that the interest of parents in the care, custody and control of their children is perhaps the oldest fundamental liberty interest recognized by this Court. *Troxel v. Granville*, 530 US 57

**CIVIL RIGHTS COMPLAINT;**
**42 USC 1983 FIRST & FOURTEENTH AMENDMENTS;**
**BREACH OF CONTRACT**

(2000). This Circuit has recently recognized, in *Flores v. Sessions* (decided June 21st, 2018) the compelling interest in family reunification. The Plaintiff has never been convicted of any serious crime, but the *five year prohibition on contact* with his children amounts to a sentence of capital punishment in respect of the Plaintiff's parenting rights. (2) The Plaintiff has also had $51,000 per month in support obligations imposed and has been ordered to pay over $15,000,000 – some to unrelated third parties – as he has battled homelessness and qualified for state aid including food stamps. The Plaintiff has been hobbled in his ability to challenge the Court's Order by his designation as a state law "vexatious litigant" which allowed Judge Massullo to ignore arguments, petitions and evidence including an OSC containing incontrovertible (and certainly uncontroverted) evidence that Defendant Stephens has been using the parties' minor children as pawns in a game of extortion. The Plaintiff now believes that his plight is not simply the result of legal errors but is the fruit of a conspiracy between the defendants and Judge Massullo to violate his constitutional rights. Neither Judge Colfax nor Judge Massullo has been joined as a defendant because they both enjoy absolute immunity under federal law.

1.      The Parties' Pre-divorce Relationship

10.     The Plaintiff married Stephens on January 14, 2005 in Santa Barbara, California.

11.     The Plaintiff had three sons with Stephens:  Alexander Georges Wescott, born October 12, 2005; Cyrus Mason Wescott; born February 15, 2008; and Darius Sebastian Wescott, born February 25, 2010. The Plaintiff enjoyed a close and loving relationship with his boys during the parties' marriage until Stephens interfered with the Plaintiff's rights, as well as her children's rights for frequent and continuing contact with their father.

**CIVIL RIGHTS COMPLAINT;**
**42 USC 1983 FIRST & FOURTEENTH AMENDMENTS;**
**BREACH OF CONTRACT**

12.    At the time of the marriage, the Plaintiff was a successful technology entrepreneur and real estate investor.  The Plaintiff brought 90%+ of the parties' assets to the marriage.

13.    Stephens was the primary source of earned income in the marriage. Stephens had a highly paid job as an investment banker.

14.    While the Plaintiff's deals and investments did very well for many years, after September 2008, Plaintiff and Stephens got caught in the credit crunch and as of late 2010, could no longer pay their mortgages or service their debt.

15.    After Stephens and Wescott encountered financial problems, Stephens did not want to change their lifestyle to adjust to new economic reality.

16.    Plaintiff began to frantically borrow monies from various parties.  For example, Plaintiff borrowed $180,000 from the Plaintiff's father, Ward Wescott ("Ward"). Independent of other obligations to him, Plaintiff and Stephens owe Ward more than $250,000, exclusive of another $50,000 or more in support that Ward provided directly to Stephens to assist her with legal issues and the cost of attorneys.

17.    During this period of 2012-2013, Plaintiff continued to borrow monies, the proceeds of which were largely sunk into maintaining Stephens' lavish lifestyle.

18.    For example, on March 6th, 2012 Plaintiff and Stephens borrowed $20,000 from the Plaintiff's friend Melissa Cardiff.  All of the monies went to Stephens.

19.    On March 26th, 2012 Plaintiff borrowed $11,000 from Plaintiff's friend Henry Petras. This was one of three loans taken from Mr. Petras.  Plaintiff borrowed another $15,000 from him in 2014.

20.    In May 2012 Plaintiff borrowed monies from Patrick Faverty.  The monies went to Stephens.  In June 2012 Plaintiff and Stephens borrowed monies from her childhood friend Paul

**CIVIL RIGHTS COMPLAINT;**
**42 USC 1983 FIRST & FOURTEENTH AMENDMENTS;**
**BREACH OF CONTRACT**

Leib, who is married to another one of her childhood friends from Los Angeles. The monies went to Stephens. The parties borrowed monies from Mark Luders. 90%+ of the monies went straight to Stephens. The parties borrowed monies from John Lee. All of the monies went straight to Stephens.

21.     As other examples of loans Plaintiff had arranged, he borrowed $600,000 from Charlie Fiechter, $1,000,000 from David Kirk, $400,000 from Rob Lonsdale, $100,000 from Jim Motter, and $400,000 from Bruce Friedman.

22.     The series of borrowings to handle Stephens' needs materially constrained the Plaintiff's room to maneuver as an investor. The Plaintiff had previously been able to secure lucrative and profitable real estate deals with little down in earnest money or deposits. Money that went into the maw of Stephens' compulsive spending was thus unavailable to seed the Plaintiff's deals and his economic recovery. At the parties' financial trial in their marital dissolution, Stephens testified and put in her trial brief that she was used to taking $100,000 vacations and that she would need to keep taking such vacations even as the parties were in bankruptcy and their houses in foreclosure.

23.     This was a significant factor in a downward spiral with respect to both the parties' marital relationship and financial position ultimately resulting in divorce and bankruptcy.


2.     The Parties' Bankruptcy


24.     The Plaintiff and Stephens filed a joint bankruptcy petition in 2012.

25.     The Plaintiff was denied a discharge in 2013 and his bankruptcy was closed (though the Plaintiff later obtained a discharge in a subsequent filing.)

**CIVIL RIGHTS COMPLAINT;**
**42 USC 1983 FIRST & FOURTEENTH AMENDMENTS;**
**BREACH OF CONTRACT**

6

26.    In 2014, Bankruptcy Trustee Hoskins sought to deny Stephens a discharge based on questionable transactions and demonstrable falsehoods (including, but not limited to provable lies under the penalty of perjury concerning the loss of a valuable diamond ring with a 3.14 carat diamond). Stephens also stole valuable artwork from the estate (hidden with the help of Kristine Schwartz) and valuable jewelry (hidden with the help of her mother, Huguette Stephens). Monette Stephens, Kristine Schwarz, and Huguette Stephens all committed multiple easily provable felonies including bankruptcy fraud.

27.    Upon information and belief, the stolen artwork ultimately made its way to Rolf Herken.

28.    Stephens attempted to preserve her discharge by arguing that her judgment was impaired as a result of spousal abuse.

29.    There are many witnesses that could then and now testify that Stephen's acts in violation of 727(a)(2)(B) and 727(a)(4)(A) were done freely, willfully, and intentionally, without even the slightest hint of abuse or duress. More importantly and relevant in the context of this proceeding, testimony or evidence from Plaintiff or anyone that had actually ever been to the parties' home would completely obliterate Stephens' hail-Mary defense that she was abused and committed her illegal and wrongful acts under the Plaintiff's Svengali-like domination and duress.

30.    The Plaintiff was not invited to Stephens' trial in which Trustee Hoskins attempted to deny Ms. Stephens' discharge. The Plaintiff was not given notice of the trial. Indeed, Ms. Stephens hid the time and date of the trial from Plaintiff, knowing that if he were present he would truthfully testify that her crazy allegations of years of spousal abuse were false. Accordingly the Plaintiff did not attend the hearing and Stephens' allegations went entirely uncontroverted although the Trustee strenuously argued that they were insufficient to negate intent.

**CIVIL RIGHTS COMPLAINT;**<br>
**42 USC 1983 FIRST & FOURTEENTH AMENDMENTS;**<br>
**BREACH OF CONTRACT**

31.    On September 30, 2014, the Court's Opinion was docketed in the matter of Stephens'

discharge. The Court accepted that Stephens was the victim of emotional if not physical abuse.

Although not even Stephens conceded that she was physically attacked, the Court accepted that

the Plaintiff was loud, domineering and intimidating and that this caused Stephens to lose her

ability to understand the meaning of her actions. Stephens was granted her discharge.


3.    The Provenance of the DVRO


32.    On the night of January 30th, 2014, Stephens attacked the Plaintiff with a knife, and the

Plaintiff initially exerted reasonable force in his self-defense.  The Plaintiff was never convicted

of any crime arising out of the Confrontation and the underlying facts have never been tested in a

hearing. Stephens begged Plaintiff not to call the police that night, and thus, he didn't.

33.    Although the Plaintiff was the one to file for divorce in June 2014, Stephens' attack

represented a *de facto* termination of the parties' marriage.

34.    After the night of January 30th, Plaintiff and Stephens came to some agreements,

including the notion that they needed time off from each other, but would still do certain things

together with their children.

35.    The Plaintiff flew in to for Cyrus' birthday party earlier in February 2014, and again, on

February 24th, 2014, Plaintiff flew in from Latin America, for Darius' birthday the following

day. The Plaintiff was put to considerable trouble and expense by adjusting international travel

plans but his solicitude was typical of his care and concern as a parent.

36.     The Plaintiff discovered, on the night of February 24th, 2014 that the locks to the parties' Ashbury house had been changed, and Plaintiff was served outside the house with papers for domestic violence (DVRO) and a TRO.

37.     The following day, February 25th, Stephens, violating the TRO that was based on perjury, called the Plaintiff and Plaintiff and Stephens celebrated Darius' birthday together.  The Plaintiff came to the Ashbury house later on February 25th, and packed up some things, since the parties agreed that they would alternate between their San Francisco and Santa Barbara houses. The Plaintiff would live in Santa Barbara until June 15th, 2014, and then Plaintiff and Stephens would swap houses for the summer, and then swap houses again on August 30th or September 1st, for the school year.

38.     Plaintiff moved to the Santa Barbara house immediately after Darius' birthday celebration in late February 2014.

39.     In February 2014, Stephens filed a DVRO arising out of the Confrontation. The facts relating to the Confrontation have never been litigated, e.g. tested in an adversary proceeding and yet the same "facts" have been repeatedly recycled by Stephens and her attorneys to justify ever–increasing punishments, broadened to cover interaction with the parties minor children.  Each time Stephens has changed the story and circumstances of what happened, including the timing and location.  In a later version she even asserted the children were present, a demonstrable falsehood.

40.     Plaintiff and Stephens agreed to settle the issue and did in fact do so, signing a stipulation in March 2014, prepared by Stephens' then attorney Michelle Harris ("Attorney Harris"). The Plaintiff had asked Stephens to hire a lawyer for the two of them in order to conserve expenses. Stephens hired Attorney Harris who freely gave legal advice about the law to the Plaintiff,

leading him to believe she was acting in his legal interests as well.  Harris billed Plaintiff for her

work and not Stephens. In fact, Attorney Harris lied about the law to get the Plaintiff to pay a

ruinous $15,000 per month to Stephens which the Plaintiff borrowed frantically to provide.

41.    In the Stipulation, the Plaintiff agreed to nothing more damning that having "anger

management issues". The Plaintiff never dreamt that this concession would be used again and

again to paint him as a dangerously violent figure.

42.    In September 2014, Harris and Stephens rendered the Plaintiff homeless, despite the fact

that they lived in three houses at the time:  San Francisco, Santa Barbara, and Tahoe.  Harris and

Stephens knew this was a violation of California law and a breach of fiduciary duty.

43.    Despite the parties' agreement, Stephens filed two more DVROs, using the same recycled

allegations from January 2014 (with the help of her attorney Terry Szucsko).  Stephens and

Szucsko knew at the time that they were violating many fundamental legal principles including

*res judicata.*

44.    The first time Stephens filed a new DVRO with the same recycled facts was in December

2014.  That time, the move was simply to prevent the Plaintiff from having visitation with the

parties' children over the holidays (as ordered by Judge Monica Wiley) and to ensure that

Stephens and her boyfriend could go skiing without having the hassle of being obliged to allow

the parties' children to see their father over the holidays.  In December 2014, the Honorable

Judge Monica Wiley had ordered that Plaintiff would have time with his three sons over the

holidays, including some time for Christmas and on New Year's Day.

45.    Szucsko, by now Stephens' attorney called Plaintiff the week of December 15th, 2014,

pretending to want to arrange logistics for the scheduled visitation, but what he was really doing

was finding out the Plaintiff's whereabouts, so that Plaintiff could be served on Friday December

19th, 2014.  Plaintiff was served on the 4th floor of 400 McAllister that morning.  Stephens and Szuksco never had any intention of following the Court's orders for visitation.  By effecting service on that day, Stephens obtained an automatic 3-week restraining order and prevented the parties' children from having any time with their father for Christmas or the holidays.

46.    The second DVRO ("DVRO 2") had the same allegations as the first one's already-settled issues, with one additional claim "new abuse" being that Plaintiff had shown up at his childrens' school to watch their Christmas performance (as Plaintiff and Stephens had agreed by email, for all previous performances).  Stephens' fraudulent DVRO paints the picture that a loving father who shows up at his childrens' school performances as Stephens had agreed was therefore abusing them and her.

47.    The third DVRO ("DVRO 3") recycled the same old allegations that the Stipulation had settled, and added new "abuse" alleging that Plaintiff had used "inappropriate language" on a Skype call.  Those allegations – themselves open to spirited dispute – could hardly justify an Order preventing Movant from having contact with his children *for five years* (opening up a related First Amendment argument given the vagueness of the allegation).

48.    As a matter of fact, though the Honorable Monica Wiley had ordered Skype calls with Plaintiff's children to occur twice a week, Stephens denied every single Skype visit (other than one brief one) for many months, denying each court-ordered Skype visitation in December, in January, February, March, April and beyond.  The Plaintiff can easily prove that as each denied Skype visitation is recorded in both parties' Skype account.

49.    Stephens also denied dozens of court-ordered visitations, including more than a dozen consecutive court-ordered visitations, with the help of Szucsko.  This is easily provable too as the denials were mostly sent in email, including all the boys' visitations with their father starting

on February 8th, 2018 and continuing for months. Stephens also denied the Court-ordered

visitations on Cyrus' birthday where he was hoping to celebrate his birthday with his father, and

on Darius' birthday where he too was hoping to celebrate his birthday. In doing so, Stephens not

only denied Plaintiff contact with his children, but deprived the children of contact with their

loving father, denying over 100 Court orders for visitation and more.

50.    And yet Stephens has received *de facto* immunity from Judge Massullo and Judge Colfax

for her flagrant and repeated violations of Court Orders.

51.    With DVRO 3, Szucsko used blatant trickery to ensure that a restraining order would be

granted. The Plaintiff was personally served with DVRO papers (a subset of the papers that were

filed at the Court) but there were no papers about the scheduled hearing on May 13th,

2015. Plaintiff believes that Szucsko deliberately pulled the papers for the hearing from the

packet. The gambit worked. The Plaintiff did not attend the May 13th, 2015 hearing about

DVRO 3, even though the Plaintiff was in town. Again, having received no notice of the DVRO

hearing, the Plaintiff did not attend. In fact, the Plaintiff went to the Courthouse that very

morning to file papers. He surely would have attended the hearing if there were papers included

in his package about the hearing.

52.    Szucsko is an amazing attorney when unopposed. A 5-year restraining order was granted

to Respondent by Judge Colfax that day, preventing any contact between the three boys and their

father. The old claims should have been blocked by *res judicata*. The only new allegation of

"abuse" was that the Plaintiff supposedly made undescribed "inappropriate comments" to his

children over Skype. The Plaintiff has preserved related Skype records and can definitively prove

that the conversation that Respondent alleges took place never took place. Moreover, if we

concede *arguendo* that "inappropriate comments" were made, no such comments could have justified a five year restraining Order.

53. Again, Stephens (through Szucsko) requested, and received, a 5-year restraining Order ("the Restraining Order") preventing Movant from interacting with his children. This represents a serious miscarriage of justice. The Plaintiff may not have been an ideal husband, but even Stephens, who has made quite a career out of lying to various Courts under oath with great success, does not allege that the Plaintiff ever abused one of his boys (the false claim about "inapproprite language" notwithstanding).

54. The Plaintiff has been a caring and loving father to the parties' children. But the Plaintiff has been denied interaction with his sons for the last three years because: (a) he defended himself from a knife attack by Stephens; (b) he showed up at a Christmas event that his sons performed at (causing his youngest son to jump for joy when he saw his father); (c) he used undescribed "inappropriate language" on a Skype call that never took place.

55. Despite the entry of the Restraining Order, the Plaintiff retained faith in and respect for the Court and did not give up in his attempt to persuade the Court that he should see his children. The Plaintiff submitted to hair follicle tests to show he was drug free and otherwise complied with the Court's requirements and demands.

56. In August of 2015 it momentarily appeared that the Plaintiff's diligence would be rewarded. Judge Colfax announced from the bench that due to the Plaintiff's exemplary compliance, supervised visitation could be arranged the following month, and then, quickly as long as there were no issues, a path to regular visitation, and then, presumably, shared custody.

57. Szucsko then read into the record – with no previous notice to the Plaintiff – the Bankruptcy Court's September 30, 2014 Opinion concerning Stephens' discharge in which the

**CIVIL RIGHTS COMPLAINT;**
**42 USC 1983 FIRST & FOURTEENTH AMENDMENTS;**
**BREACH OF CONTRACT**

13

Plaintiff was described as domineering and emotionally abusive. Upon hearing the Opinion, Judge Colfax reversed herself and ordered absolutely no contact with the children despite the fact that: (1) the Court's findings had not been open to challenge by the Plaintiff; (2) only Plaintiff submitted evidence in connection with the Plaintiff's conduct; (3) the Plaintiff's conduct would have occurred (had it occurred at all) years before the date of the Family Law hearing and; (4) no allegation was made even before the Bankruptcy Court that reflected even indirectly on the Plaintiff's fitness as a parent.

58.    Judge Colfax's sudden, unexplained and manifestly improper reversal based on incompetent evidence was entirely consistent with the EJA. Szucsko invited her to punish the Plaintiff for being a domineering male and Judge Colfax did so by denying the Plaintiff access to his children despite her expressed inclination to allow such access.

59.    The Plaintiff has conjunctively been hobbled in his ability to challenge Stephens' innumerable earlier violations of Court Orders concerning visitation and his DVRO by virtue of his designation as a Vexatious Litigant ("VL"), under CCP 391.7 pursuant to petition by Szucsko in November 2016. That RFO was filed just after the Plaintiff declared bankruptcy, thus violating the Plaintiff's Automatic Stay.

60.    The Plaintiff's VL designation – itself problematic under the terms of CCP 391.7 – has impermissibly burdened his assertion of fundamental constitutional rights by subjecting him to a judicial prescreening of any motion in his family law case. This "prescreening" has, in the case of Judge Massullo, been pre-textual as she rejected every single filing by the Plaintiff for years.

61.    Most of these rejections came without justification or explanation, or on the rare occasion when an explanation was provided, Judge Massullo would cite incorrect justification. The best example illustrating Judge Massullo's attitude to the Plaintiff's filings, in this case for an OSC

**CIVIL RIGHTS COMPLAINT;**
**42 USC 1983 FIRST & FOURTEENTH AMENDMENTS;**
**BREACH OF CONTRACT**

asking for the Court's help in seeing his children for Court-ordered visitation, and to proceed

with an OSC against Stephens for denying same, was Massullo stamping, in red ink, DENIED

DENIED DENIED DENIED DENIED DENIED DENIED DENIED DENIED DENIED

DENIED all over the page, as if discouraging Plaintiff from having the temerity to ask the Court

for help in making sure the Court's orders were carried out.

62.     The Plaintiff has thus lost what the United States Supreme Court has described as the

oldest fundamental liberty without due process protections.

63.     On March 9th, 2016, Judge Massullo convened a hearing on support obligations with

approximately 15 minutes' notice to the parties.  Neither party submitted any evidence and

indeed this hearing was not noticed and therefore neither party could submit evidence or a brief.

Stephens via Szucsko submitted an offer of proof that Plaintiff made $100,000 per month,

knowing full well that she had rendered Plaintiff homeless at this point, and provided perjurious

testimony.

64.     One aspect of Stephens' further perjurious testimony is that she had no income.  Stephens

has actually submitted zero income for all related filings and testimony for years, while being

CEO of a company of 15 employees and having many jobs and contracts.  Thus, Stephens has

continued her pattern of lying to Court under oath, that has served her well thus far.  These are

yet more examples of Szucsko's suborning perjury.

65.     Plaintiff truthfully testified that he made no money and reference dozens of documents in

the docket, providing to Court, and served upon opposing counsel, including 10 years of tax

returns.

66.     Nevertheless. Judge Massullo, as part of the EJA, decided to ignore all evidence and

accept Stephens and Szucsko's notion that a homeless man on food stamps with no possession,

not even a laptop to work with (as Stephens had stolen it), was making $100,000 a month. The Plaintiff, in actuality, lost his car to an impound and, the following year, lost his office as he was unable to pay rent. Nevertheless, Judge Massullo ordered Plaintiff to pay over $55,000 a month in support based on Plaintiff's supposed earnings.

67.     Seven months later, the Trial in the Plaintiff's Family Law case took place on October 11th and 13th, 2016.

68.     In the Final Order, Judge Massullo imposed support obligations of $51,000 per month on the Plaintiff despite the fact that he had been reduced to virtual homelessness (at that point the Plaintiff still had an office rented by a friend that he slept in). The Plaintff had had no income for years after Stephens had rendered him homeless (while she lived in three houses – San Francisco, Santa Barbara, and Tahoe). The Plaintiff had submitted his tax returns for ten years to Court and had filed his taxes in the docket and served them upon Stephens. Stephens testified perjuriously about $100,000 vacations that the Plaintiff had paid for (provably false). Stephens testified perjuriously about many other facts. Szucsko suborned her perjury.

69.     Judge Massullo would not allow Plaintiff to enter his tax returns in to evidence at the trial, despite them being in the docket already and having been served upon Stephens.

70.     As noted above, Stephens had previously provided an offer of proof along with other perjurious testimony (in March 2018), that Plaintiff made $100,000 per month. His tax returns, available to the Court, show approximately $400/month of income for ten years. Stephens and Szucsko were obviously aware of the true facts of the parties' income.

71.     California law for a short-term marriage is that the supporting spouse pays support for half the length of the marriage if necessary. Stephens was the supporting spouse. The parties were married for 7 years. Nevertheless, ignoring evidence and the Plaintiff's testimony under

oath and the law, Judge Massullo granted Stephens' request for support, ordering Plaintiff to pay over $50,000 per month in support for 10 years forward in addition to the four years' support that the Plaintiff had already paid or accrued since the parties separation date.  Thus, rather than Stephens paying Plaintiff for 3+ years, the Plaintiff was ordered to pay almost $10 million in support to Stephens.  Given that only about half of that was tax-deductible, the Plaintiff would need to make about $15 million to pay that

72.     Stephens also requested, and Massullo granted, $7 million more based on further perjurious testimony, with little or no evidence submitted.  Thus, Plaintiff would need to make another $14 million (pre-tax) or so to pay the other $7 million+ ordered to be paid (post-tax), for a total necessary earnings of close to $30 million to comply.

73.     In reality, the Plaintiff has not made a penny in over 4 years, is on the streets, and has no possessions of value.

74.     This miscarriage of justice and the ETA also fundamentally impact Plaintiff's liberty. Stephens has filed OSCs to try to put Plaintiff in jail for not paying her enormous support payments.

75.     The Plaintiff subsequently, two months later, applied for and received food stamps, as at that point it had been over two years since Stephens had rendered him homeless.  He had been seeking his laptops and other equipment that were at the houses and for two years Stephens had lied under oath that she did not have them.  At the marital dissolution trial, Stephens finally admitted that she had had the laptops and had given them to her former attorney, Ms. Harris.

76.     Judge Massullo's Order also adopted the "findings" of Dr. Boyd, a psychologist, who more whimsically than scientifically, denominated the Plaintiff a "sociopath" for the purpose of denying the Plaintiff *all* visitation rights, supervised or unsupervised and all *communication* with

1   his three sons including phone calls or emails. The Diagnostic and Statistical Manual of Medical

2   disorders ("DSM") does not use the term "sociopath" which is a pseudo-scientific "diagnosis".

3   The Plaintiff has never been convicted of a serious crime and was never accused of any violent

4   act by Stephens until the Confrontation. The Plaintiff has *never been accused of any act of abuse*

5
6   *or malfeasance as a parent*. Dr. Boyd's "diagnosis" facilitated by the perjury of multiple

7   witnesses and Stephens' own perjury is clinically and scientifically worthless and manifestly

8   cannot justify the functional destruction of the Plaintiff's role as a father.

9   77.     The Plaintiff's default position is to respect the judicial system including the judicial

10  system of the state of California. The Plaintiff has, in recent years, visited more courtrooms than

11
12  he had ever anticipated or desired and has found most sitting judges at both the state and federal

13  level to be honest and diligent, with statistically predictable variability in aptitude and

14  personality. Accordingly, the Plaintiff does not make accusations of judicial misconduct lightly.

15  Relatedly, the Plaintiff deplores spousal abuse but the Plaintiff is emphatically not an abuser.

16
17  The Plaintiff absolutely admits that Stephens and he had a physical altercation on the night of

18  January 30th, 2014.

19  78.     On January 8th, 2018, the Plaintiff presented a comprehensive Order to Show Cause

20  ("Global OSC") to Judge Massullo detailing 164 of Stephens' violations of Court orders,

21  including 98 denied Court-ordered visitations. The Global OSC was necessarily a robust filing so

22
23  the Plaintiff will not burden the Court with an exhibit at this juncture though it will undoubtedly

24  be entered into evidence at an appropriate point. The violations by Stephens and her attorneys,

25  particularly with respect to the Plaintiff's visitation rights, are massive, undeniable and

26  inarguable.  Even just a few denied visitations can be grounds for a chance of custody under

27  California law.  The Plaintiff consulted many attorneys, and each informed the Plaintiff that this

28

**CIVIL RIGHTS COMPLAINT;**
**42 USC 1983 FIRST & FOURTEENTH AMENDMENTS;**
**BREACH OF CONTRACT**

was the worst case of denied visitations they had ever heard of. Thus, Stephens and Szucsko's conduct likely represents the worst, or certainly one of the worst, examples of denying children and a parent their fundamental rights, in the history of California.

79.    However, because part of Stephens' plan was to render the Plaintiff homeless and steal all his possessions, a total breach of fiduciary duty, the Plaintiff could not afford a competent attorney.

80.    Because of the Plaintiff's Vexatious Litigant designation (itself un-deserved), Judge Massullo was required to conduct a preliminary "screening" of the Plaintiff's submission for "merit" before having it served on Stephens. Judge Massullo denied the Global OSC without comment or explanation. It was at the time of this entirely arbitrary denial that the Plaintiff first became aware that the coordination between Judge Massullo and the Defendants was in fact a conspiracy to deprive him of his constitutional rights.

81.    Specifically, the Plaintiff alleges that he has suffered a loss of constitutional rights by an EJA between Judges Massullo & Colfax and Defendants Szucsko and Stephens. This EJA led Judge Massullo to ignore overwhelming evidence of the Plaintiff's destitution (accepted by the State of California which continues to issue food stamps to the Plaintiff every month) and uncritically accept bizarre testimony from Stephens that the unrepresented (and unhoused) Plaintiff was earning $100,000 per month. The same extra-judicial agreement has led Judge Colfax and later Judge Massullo to enforce a five year ban on any contact between the Plaintiff and his three sons based on no sanctionable (or, in the case of the "inappropriate language" even *described*) conduct and affirmed on the basis of rank medical quackery facilitated by outright perjury. The judicial designation of the Plaintiff as "vexatious" has in turn placed procedural impediments on fundamental constitutional rights that are entitled to procedural safeguards.

82.     In sum and substance, the Plaintiff is in a juristic trick-box. His sons mean the world to him. Between Stephens' unpunished violations of visitation orders and agreements and the cycle of DVROs based on fabricated trivialities, the Plaintiff has had his parental rights terminated by a California court despite his demonstrable and provable conscientiousness and fitness as a parent. The Plaintiff reluctantly concludes that he requires this Honorable Court to vindicate his fundamental rights.

83.     The Plaintiff has no basis to allege that Judge Massullo has been bribed by the Defendants and frankly doubts that this would have been the case. What the Plaintiff is alleging is that the Defendants and Judge Massullo functionally agreed to dramatically and systematically deviate from federal law, state law, and from the protections of the United States and California constitutions in adjudicating the Plaintiff's family law case. Such an agreement is illegal even without financial corruption. The Plaintiff has lost his rights as a result of this illegal agreement.

84.     The requisite meeting of the minds in relation to the EJA in this case may be inferred from the following specific facts:

(a)     Judge Colfax improperly (and unethically) rejected a preemptory challenge from the Plaintiff pursuant to CCP 170.6 in September of 2014.

(b)     Judge Colfax's August 2015 reversal of her announced decision to permit at least supervised visitation starting the following month was **cued** by Szucsko's improper, non-noticed and prejudicial insertion of the September 30, 2014 Bankruptcy Court Opinion into the record. The Plaintiff was manifestly deprived of due process by this maneuver, having been punished again for spurious, fraudulent and perjurious allegations of emotional abuse from years before which had no bearing whatsoever on his fitness as a parent.

(c)     Judge Massullo ignored overwhelming evidence of the Plaintiff's destitution (readily accepted by the State of California) to accept non-credible testimony from Stephens – with no documentary or evidentiary support – contending that the Plaintiff enjoyed a massive hidden income. Even if the income were to be conceded arguendo, Judge Massullo undertook no separate analysis of the Plaintiff's economic needs in setting support levels and making the final property division.  Judge Massullo also ordered an addition $7 million beyond spousal support in other payments to Stephens with no evidence and no analysis.

(d)     Judge Colfax entered a five year restraining order preventing the Plaintiff from having any contact with his sons based on undescribed "inappropriate comments" on a fictive Skype call. This departs so dramatically from California law that seeks to preserve familial relationships and is so manifestly excessive in relation to any submitted evidence that it can only be understood as an extra-judicial act.

(e)     Judge Massullo affirmed the restraining order and ordered no contact with the parties' three boys in her Final Order based on a demonstrably pseudo-scientific "diagnosis" by one expert that was entirely unrooted in any culpable *conduct* on the part of the Plaintiff. Even if the Plaintiff suffered from anti-social personality disorder – the medically recognized diagnosis – it could not justify the termination of parental rights. Judge Massullo may as well have, and at least as scientifically terminated the Plaintiff's parental rights for being a Gemini.

(f)     Judge Massullo refused, without explanation, to consider detailed and uncontroverted allegations of evidence of systematic violations of Court orders on the part of Stephens. Under California law, such a comprehensive record of noncompliance may serve as a justification for a change in custody. Because of the VL Order, Judge Massullo's practical discretion is boundless

1  and is unfailingly exercised against the Plaintiff against the overwhelming weight of the

2  evidence.

3  (g)      Judge Massullo ignored testimony under penalty of perjury from the Court's own

4  appointed visitation supervisor, Ms. Rabia Sana, which essentially stated that Plaintiff was one of

5  the better fathers she had ever seen, and that Ms. Stephens did everything she could do to

6

7  interfere with visitation, jerking around the locations so that no visitation would occur, just not

8  showing up week after week, and having her attorney send email denying court ordered

9  visitations.  Ms. Stephens also ordered Ms. Sana not to show up, tried to scare Ms. Sana by

10
   asserting that Plaintiff was armed and dangerous, and even tried to bribe Ms. Sana not to appear
11
12 for visitation.  Ms. Stephens offered Ms. Sana more money than she was making to work

13 elsewhere that Ms. Stephens would arrange.  Incredibly, Ms. Stephens did almost all of this via

14 email and text message, and thus there is incontrovertible evidence to show what Ms. Stephens

15 did.  Ms. Sana included some text messages from Ms. Stephens in her affidavit under oath.

16

17

18

19              **Count I – 42 USC 1983 – Violation of Fourteenth Amendment Rights**

20

21 85.      The Plaintiff realleges paragraphs 1-84 as if fully set out herein.

22
   86.      The Fourteenth Amendment to the United States Constitution protects the Plaintiff from
23
24 the deprivation of his liberty or property without due process or from arbitrary acts that deprive

25 the Plaintiff of his liberty.

26 87.      The familial right of association is a Fourteenth Amendment liberty interest. *Kraft v.*

27 *Jacka*, 872 F.2nd 862, 872 (9th Cir. 1989).

28

                            **CIVIL RIGHTS COMPLAINT;**
                 **42 USC 1983 FIRST & FOURTEENTH AMENDMENTS;**              22
                            **BREACH OF CONTRACT**

88.     The Defendants have violated the Plaintiff's Fourteenth Amendment rights <u>under color of state law</u> by entering into the EJA, in fact a conspiracy with Judges Colfax and Massullo to entirely deprive the Plaintiff of his right to associate with his three sons and by imposing financial burdens on the Plaintiff that are egregiously disproportionate to his means and lawful responsibilities thereby unconstitutionally depriving him of property without due process of law.

89.     The Defendants have discriminated against the Plaintiff on the basis of his male gender by conclusively presuming him to be guilty of spousal abuse and depriving him of his parental role and his property as summary judgment for that putative abuse.

90.     As a direct and proximate result of the Defendant's acts, the Plaintiff has been damaged in losing the companionship, society, love and regard of his three children which has in turn caused the Plaintiff pain and anguish; and by imposition of over $15 million in liabilities; and the ongoing interference with the Plaintiff's prospectively advantageous economic relations..

## Count II – 42 USC 1983 – Violation of First Amendment Rights

91.     The Plaintiff realleges paragraphs 1-84 as if fully set out herein.

92.     Judge Colfax's ruling, pursuant to the EJA, granting the Defendants' DVRO on the basis of "inappropriate language" on a Skype call violated the Plaintiff's rights under the First Amendment to the United States Constitution for burdening and punishing the Plaintiff's speech without justification or explanation.

93.     As a direct and proximate result of the Defendant's acts, the Plaintiff has been damaged in losing the companionship, society, love and regard of his three children.  That, in turn, has caused the Plaintiff pain and anguish, as well as anguish to his children.

**CIVIL RIGHTS COMPLAINT;**
**42 USC 1983 FIRST & FOURTEENTH AMENDMENTS;**
**BREACH OF CONTRACT**

23

**Count III – Breach of Contract - Stephens**

94.    The Plaintiff realleges paragraphs 1-84 as if fully set out herein.

95.    In the original Stipulation, the parties negotiated a reasonable visitation schedule. The Plaintiff provided Stephens with large financial support and conceded the issue of custody in return for the visitation rights negotiated.

96.    Beginning in late 2014, Stephens repeatedly and flagrantly violated the parties' agreement by repeatedly denying scheduled visitation without cause or, indeed, explanation. The denials became the rule instead of the exception.

97.    Stephens' conduct in denying the Plaintiff's visitation rights was willful and malicious.

98.    As a direct and proximate result of the Defendant's breaches, the Plaintiff has been damaged in losing the companionship, society, love and regard of his three children that has in turn caused the Plaintiff pain and anguish.

**Count IV Declaratory Relief 28 USC 2202**

99.    The Plaintiff realleges paragraphs 1-84 as if fully set out here.

100.    There is an active and live controversy between the parties concerning the constitutionality of both the DVRO and the Final Order in the Plaintiff's Family Law case.

101.    Accordingly the Plaintiff asks this Court to Adjudge, Order and Decree:

(a)    That the DVRO (restraining order) in this case is unconstitutional and unenforceable as it violates the Plaintiff's rights under the First and 14th amendments to the United States Constitution;

**CIVIL RIGHTS COMPLAINT;**
**42 USC 1983 FIRST & FOURTEENTH AMENDMENTS;**
**BREACH OF CONTRACT**

24

1    (b)      That the Final Order in the Plaintiff's Family law case is unconstitutional and

2    unenforceable as it violates the Plaintiff's rights under the 14th amendment of the United States

3    Constitution.

4

5    WHEREFORE, Plaintiff prays

6

7    a.      As to Count I against Stephens and Szucsko for damages, in an amount to be proven at

8    trial for the loss of companionship of his children plus the imposition of exemplary damages in

9    an amount sufficient to punish and deter the Defendants from violating the Plaintiff's

10    constitutional rights in the future.

11

12    b.      As to Count II Stephens and Szucsko for damages, in an amount to be proven at trial for

13    the loss of companionship of his children plus the imposition of exemplary damages in an

14    amount sufficient to punish and deter the Defendants from violating the Plaintiff's constitutional

15    rights in the future.

16

17    c.      As to Count III against Stephens, for damages in an amount to be proven at trial for the

18    loss of companionship of his children plus the imposition of exemplary damages in an amount

19    sufficient to punish and deter the Defendant from wilfully breaching contracts in the future.

20    d.      As to Count IV for this Court to Adjudge Order and Decree that the DVRO restraining

21    him from seeing his children and the Final Order in his family law case violate his rights under

22    the First and Fourteenth Amendments to the United States Constitution.

23

24    e.      For such other and further relief as the Court deems just.

25    RESPECTFULLY SUBMITTED on August 10th, 2018

26                                                CARL A. WESCOTT

27

28    .

**CIVIL RIGHTS COMPLAINT;**
**42 USC 1983 FIRST & FOURTEENTH AMENDMENTS;**
**BREACH OF CONTRACT**